IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, § <br> § <br> Plaintiff, § <br> § <br> v. § <br> § <br> MIGUEL ANGEL DELGADO, JR., § <br> § <br> Defendant. § | CRIMINAL NO. EP-23-CR-00466-KC |

**GOVERNMENT'S NOTICE OF INTENT TO USE EXTRINSIC EVIDENCE
PURSUANT TO FRE, RULE 404(b)**

The United States of America, by and through the United States Attorney for the Western District of Texas, and the undersigned Assistant United States Attorneys, files this, its Notice of Intent to Use Extrinsic Evidence pursuant to FRE, Rule 404(b) against the defendant, **MIGUEL ANGEL DELGADO, JR.** The government hereby serves notice upon the defendant in this cause that the government will seek to introduce certain extrinsic evidence, detailed more fully below, during its case-in-chief at trial in the above captioned cause.

    I.      **FACTUAL AND PROCEDURAL BACKGROUND**

On March 8, 2023, defendant, Miguel Delgado, Jr. (hereinafter, "Delgado"), was charged by a grand jury sitting in the El Paso Division of the Western District of Texas in a three count felony indictment, EP:23-CR-00466-KC, with two counts alleging violations of Title 18, United States Code, Section 242, Deprivation of Rights under Color of Law, one occurring on June 15, 2020 and the other occurring on October 20, 2019, and with one count alleging a violation of Title 18, United States Code, Section 1519, Destruction, Alteration, or Falsification of Records in Federal Investigations.

The first two counts, each allege Deprivation of Rights under Color of Law and accuse defendant, United States Customs and Border Protection Officer (CBPO) Delgado of using excessive force, that is, of willfully depriving an individual of the right, secured and protected by the Constitution (including the Fourth Amendment) and laws of the United States, to be free from unreasonable seizures, which includes the right to be free from the use of unreasonable force by a law enforcement officer.  The charges, occurring June 15, 2020, and October 20, 2019, are based, in part, on activities occurring in the Pedestrian Control Secondary (PCS) area at the Bridge of the Americas (BOTA) Port of Entry (POE) and were both captured y by security camera surveillance, including sound, on each charged date.

### A.  Count 1 (June 2020 Incident):

On June 15, 2020, at approximately 12:03 a.m., Victim-1 (V-1), a United States Citizen, arrived at the BOTA pedestrian lane.  A CBP officer examined his identification and escorted him to PCS.  On that date, Defendant, CBPO Delgado, was assigned to work secondary screening and was seated in a secured area in a booth with a safety glass that separated the area from the public.  When V-1 arrived at the window, he commented that an officer yelled at him.  Delgado responded, "Don't cross if it bothers you.  You can stay at home if you want."  Delgado appeared angry as he raised his voice while speaking with V-1.

After the verbal exchange, Delgado ordered V-1 to sit down.  V-1 complied with Delgado's commands and sat down in the waiting area.  Minutes later Delgado initiated the verbal exchange again with V-1 reminding him that, , "This is my house, not yours."  V-1, while still seated, gestured with his arm saying, "Here it is [your house], but outside is not your house . . . This is your house, but outside this room is not your house."

Delgado immediately shouted at V-1, "Come here! Are you going to threaten me, man?" He continued, "Come here, fucking big mouth! Are you going to threaten me?" Delgado then got up from his chair and ordered V-1 to walk to the security door. V-1 complied at once. When V-1 got to the door, Delgado opened it and grabbed V-1 by the arms. Delgado moved behind V-1, restraining V-1's arms behind his back. Delgado then dragged V-1 further into the secondary screening area toward a set of chairs positioned against the wall. Delgado quickly turned and slammed V-1, face first, into a row of chairs, causing V-1 to fall to his knees, with his face hitting a chair.

Delgado locked V-1's right arm behind his back. He screamed at V-1 as he pulled and applied pressure to V-1's arms, causing V-1 to cry out in pain. Delgado removed V-1's baseball cap from his head and hit the victim with it before tossing it on the ground. Delgado then seized V-1's left arm and placed it behind his back. V-1 moaned in apparent pain. Delgado then pushed V-1's face into the chairs with his left hand, as he continued to restrain V-1's arms with his right hand. When V-1 lifted his head from the chair to tell Delgado that he did not threaten him, Delgado again shoved V-1's face into the chairs.[1] V-1 sobbed. Other CBPOs approached and assisted Delgado with handcuffing V-1. Delgado continued to chastise V-1 after the incident, while V-1 sat silently in a chair. V-1 dropped to his knees and appeared to beg Delgado to forgive him. CBPO Delgado was placed on administrative duty immediately after the use of force against V-1. The letter, from the BOTA Watch Commander, detailed, in part, that Delgado was placed on administrative duty "due to [Delgado's] demonstration of and/or evidence of violent, dangerous, or threatening behavior to a degree that [his] your judgment to carry a firearm is questioned." The

---

[1] V-1 received a cut on the bridge of his nose and had trouble stopping the bleeding. However, he refused medical attention.
[2] This description was taken from the El Paso I.S.D. Incident Report written February 3, 2012. It is not verbatim.

letter also stated that CBPO Delgado was "observed using what appeared to be excessive force during the inspection and handling of [V-1]."

### B. Count 2 (October 2019 Incident):

V-2 and his wife arrived at the BOTA POE on October 20, 2019, at 2:19 a.m. When they got to the pedestrian lane, V-2's wife realized she did not have her Legal Permanent Resident Alien Card (LPR) with her.

While they were in the public lobby waiting for someone to bring the wife's LPR card, V-2 and his wife sat down in the first row of chairs. They were well dressed but appeared somewhat intoxicated. A female CBPO, located behind a desk and protective glass, demanded that they sit in the back row. Although this is not entirely clear in the video footage, V-2 may have extended his middle finger at the officer when he got up and moved to the other row as the female CBPO remarked, "Go flip someone else off!" She then ordered V-2 to "Come here." V-2 yelled, "You come over here."

Defendant Delgado, who had been sitting in the PCS station next to the female CBPO, immediately got up from his chair and quickly went through the security door to the lobby. As he walked towards V-2, CBPO Delgado twice asked V-2, "What's the problem?" He added, "That's how you talk to females? That's how you talk to female officers?" Backup officers quickly reported to the lobby area. About three minutes transpired between the time CBPO Delgado walked into the lobby and when another camera captured CBPO Delgado escorting a handcuffed V-2 to PCS.

In PCS, Delgado walked behind V-2, using both hands to restrain V-2's arms. When they entered PCS, Delgado remarked, "Tough guy, huh?" The video showed that, as they walked, Delgado did not give V-2 any instructions or verbal commands. Delgado however, without

4

warning, abruptly yanked V-2 towards a closed wooden door, hitting V-2's head on the door. Delgado yelled as he yanked V-2 away from the door: "I did not tell you to walk that way!" He then opened the door and yelled at V-2 again, "Go the way I am telling you to go." The physical encounter resulted in apparent and significant scuff marks on the floor—apparently from V-2's shoes when Delgado yanked him towards the door.

### C. Extrinsic Act (February 2012 EPISD School Bus Incident)

On February 2, 2012, El Paso Independent School District (EPISD) Police Officer Rivera was dispatched to Henderson Middle School to receive information from a basketball coach, regarding a school bus being detained on a highway by an off-duty law enforcement officer. When the officer arrived at the school, the officer observed numerous students and parents in the parking lot. The officer met with the two coaches who had been on the bus as well as with a parent who advised he had witnessed the incident.

The coaches advised the EPISD Officer that they were on the bus returning to Henderson after a basketball game. The bus was southbound on US 54, at approximately 10:00 p.m., when a male in a silver truck (later identified as Delgado) pulled up to the bus, turned on the dome light in his personal vehicle and flashed a badge signaling the bus driver to stop the bus. The (then) unknown male continued flashing his badge and kept inching his vehicle towards the bus in order to force it to stop on the roadway, which the bus driver did, stopping at US 54 (South), Mile Marker 21 (b). At that point Delgado exited his vehicle and went around to the bus door and flashed his badge again at which time the bus driver opened the door.

Delgado entered the bus and demanded to know who was in charge of the bus, informing the driver that he was a federal officer. Delgado advised one of the coaches that someone had thrown an object out from the window, and it hit his truck and that someone also spit on his truck.

5

Delgado also stated that he had seen the kids laughing at what they had done. Delgado persistently asked to know who had thrown the object and, according to the coach, one student advised he had thrown a pen cap out the window. The coach asked the student to apologize, and Delgado began to lecture the student inside the bus.

When Delgado was finished admonishing the student, he exited the bus at which time a parent, who had been following the school bus along with several other vehicles, confronted Delgado and asked him for identification. Delgado flashed his badge at one of the coaches, who then observed that the badge read US Border Patrol, but he could not make out the identification number. The coach kept insisting on getting Delgado's ID number and Delgado again stated he was a federal agent. Delgado flashed his badge again but would not state his ID number. After the discussion with the coach, Delgado became uncooperative and walked back to his vehicle and drove away. [2]

The video footage from the bus corroborated the witness' description of the event. The footage included the license plate of the truck, which was now blocking the front of the bus. The license plate number was run by the police and indicated that defendant Delgado was the registered owner. Customs and Border Protection Internal Affairs verified that the individual who stopped and boarded the school bus on Highway 54 was defendant Delgado. Delgado was cited by EPISD Police for Disruption of Transportation (Texas Education Code 37.126).

 II.      LEGAL STANDARD

        A. **18 USC 242, DEPRIVATION OF RIGHTS UNDER COLOR OF LAW**

---

[2] This description was taken from the El Paso I.S.D. Incident Report written February 3, 2012. It is not verbatim.

In *United States v. Brugman*, 364 F.3d 613, 616 (5th Cir. 2004), the Fifth Circuit articulated the elements necessary to prove a violation of 18 USC § 242: "A violation of 18 U.S.C. § 242 requires an individual to: "1) willfully; 2) deprive another of a federal constitutional right; 3) under color of law." Regarding "excessive force" the *Brugman* Court articulated three other specific elements: "(1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable." *Id.,* (quoting *Bazan v. Hidalgo County,* 246 F.3d 481, 487 (5th Cir.2001) "Whether force is reasonable in an excessive force case is viewed under an objective standard, *i.e.,* 'the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them.'" *Brugman* at 616, (quoting *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865 (1985)). These circumstances include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Graham,* 490 U.S. at 396).

### B. FRE.RULE 404(b); EXTRINSIC ACTS

Federal Evidence Rule 404(b) provides as follows:

> (b) Crimes, Wrongs, or Other Acts.
>
> (1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> (2) Permitted Uses; Notice in a Criminal Case. This ***evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.*** (Emphasis added)

The Fifth Circuit, in *United States v. Gordon*, 780 F.2d 1165, 1173 (5th Cir. 1986), noted "[t]his circuit has consistently followed the doctrine on the admissibility of offenses extrinsic to a defendant's indictment to prove criminal intent articulated in *United States v. Beechum,* 582 F.2d 898 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979); *Beechum* establishes a two-part test for the admissibility of extrinsic evidence:

1. It must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character.

2. The evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of Rule 403. Citing *Beechum* at 911.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." *United States v. Gordon*, 780 F.2d 1165, 1173 (5th Cir. 1986)

> In the context of a claim that the extrinsic offense is relevant to the issue of intent, …relevancy is determined by comparing the state of mind of the defendant in perpetrating the respective offenses. The reasoning is that because the defendant had unlawful intent in the extrinsic offense, it is less likely that he had lawful intent in the present offense. *Beecham* at 941. A finding that the offenses involved the same state of mind renders the extrinsic offense relevant to an issue other than character because it lessens the likelihood that the defendant acted with lawful intent in connection with the charged offense.

*United States v. Gordon*, 780 F.2d 1165, 1173–74 (5th Cir. 1986) (relying on *Beechum,* 582 F.2d at 911). "[A] trial court has broad discretion in determining the admissibility of evidence, including its relevance, probative value, and prejudicial effect." *United States v. Prati*, 861 F.2d 82, 86 (5th Cir. 1988)    Furthermore, "the extrinsic offense and the charged offense do not have to be identical for the extrinsic offense to be relevant." *United States v. Charles*, 366 F. App'x 532, 538 (5th Cir. 2010).  The standard used in the relevancy inquiry is whether the evidence has "any

8

tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Beechum*, 582 F.2d at 911 (quoting FED. R. EVID. 401). In other words, when offered to show knowledge, the similarity of the physical elements of the crime need not be proven; "[t]he extrinsic offense need merely be of such a nature that its commission involved the same knowledge required for the offense charged." *Beechum*, 582 F.2d 912, n.15.

Where the prior offense involved the same intent required to prove the charged offense, that prior offense is relevant and [the court is] required only to consider whether the requirements of Rule 403 are met under *Beechum's* second prong." *United States v. Cockrell*, 587 F.3d 674, 679 (5th Cir. 2009) (citing *United States v. Broussard*, 80 F.3d 1025, 1040 (5th Cir.), cert. denied, 519 U.S. 906 (1996)). The similarity of intent required between the extraneous act and the charged offense means only that the defendant must "indulg[e] himself in the same state of mind in the perpetration of both the extrinsic and charged offenses." *Beechum*, 582 F.2d at 911. The government must still show that "the jury could find that the defendant committed the extrinsic offense." *Id.* at 913; FED. R. EVID. 104(b).

III. ARGUMENT

    A. First *Beechum* Prong: The school bus incident is relevant to Delgado's intent, motive, and absence of mistake.

The school bus incident is relevant in this case to issues other than Delgado's character and proves intent, motive, and absence of mistake regarding Counts One and Two. Namely, the school bus incident has high probative value given that intent will be a key issue at trial. *See, e.g.*, *United States v. Rojas*, 812 F.3d 382, 405 (5th Cir. 2016); *United States v Smith*, 804 F.3d 724, 736 (5th Cir. 2015); *Beechum*, 582 F.2d at 914–15; *United States v. Juarez*, 866 F.3d 622, 627 (5th Cir.

9

2017). As noted above, the Government is required to prove Delgado acted willfully regarding the charged incidents. By pleading not guilty, Delgado has put his intent at issue. *See United States v. Davis*, No. CR 22-197-01, 2023 WL 3903805, at *2 (W.D. La. June 8, 2023) (relying on *United States v. Juarez*, 866 F.3d 622, 627 (5th Cir. 2017) ("It would seem that by pleading not guilty, [the defendant] has placed his intent at issue, and thus the 1998 conviction is relevant as probative of [the defendant's] state of mind.")

Delgado's actions during the school bus incident in 2012, when he was cited for misusing his federal badge and law enforcement status to illegally pull over the bus, effectively detaining everyone aboard, are proof that Delgado had the same intent to willfully misuse his authority and deprive the victims of their civil rights during the charged incidents. The Government intends to use the bus incident to show Delgado's actions were not the result of a mistake but rather were willful. *See U.S. v. Boone*, 828 F.3d 705, 711-712 (8th Cir. 2016) (The extrinsic offense may be admitted to show willfulness and specific intent.")

In the Civil Rights context specifically, the Eighth Circuit affirmed the trial court's admission of such prior act evidence during the trial of a law enforcement officer similarly charged with subjecting another to unreasonable force in violation of Fourth Amendment. In *Boone*, the trial court admitted evidence that the defendant used unreasonable force in an earlier incident against another. The Eighth Circuit agreed that the prior incident was relevant to show willfulness,[3] and supported the conclusion that the defendant acted with specific intent to deprive another of their constitutional rights. *Boone*, 828 F3.d. The *Boone* Court added that prior acts need not be "duplicates," noting that the extrinsic proof showed that defendant "used more force than

---

[3] To prove willfulness, the government is required to show that the defendant acted with specific intent to deprive the victim of their constitutional rights. *United States v. Boone*, 828 F.3d 705, 711 (8th Cir. 2016)

10

necessary to subdue an individual who was acting erratically or disruptively," then made reports that "failed to accurately document his use of force," thus, the circumstances were sufficiently similar.

While there is some authority that one of the several factors in determining the admissibility of an extrinsic act is the amount of time that has passed since the previous conviction, "such factor is not determinative." *United States v. Charles*, 366 F. App'x 532, 538 (5th Cir. 2010) relying on *U.S. v. Arnold,* 467 F.3d 880, 885 (5th Cir.2006).[4] In *Charles* at 538*,* the Fifth Circuit noted that in "*Arnold, id.,* we observed that we had upheld the admission of Rule 404(b) evidence where the time period was as much as 15 and 18 years before the charged offense."

### B. Second *Beechum* Prong: The probative value of the school bus incident is not outweighed by the danger of unfair prejudice.

Here, the probative value of the extrinsic offense evidence is not substantially outweighed by the danger of unfair prejudice. Determining the admissibility of evidence under this standard calls for "a commonsense assessment of all the circumstances surrounding the extrinsic offense." *United States v. Guerrero*, 650 F.2d 728, 734 (5th Cir. 1981) (quoting *Beechum*, 650 F.2d at 914).

In determining the probative value of the evidence, the trial court could examine the following factors: (1) the prosecutor's need for the evidence; (2) the overall similarity of the extrinsic act and the charged offense; (3) the temporal proximity of the two; and (4) undue prejudice to the defendant. *United States v. Scott*, 795 F.2d 1245, 1252 (5th Cir. 1986); *Guerrero*, 650 F.2d at 734; *Beechum*, 582 F.2d at 914, 915. Regarding the nature of the evidence, the court need not be convinced that a defendant committed the extrinsic offense; nor is the government required to produce clear and convincing evidence of such acts. *Id.* at 913. The evidence should be admitted unless the jury could not reasonably find that the defendant committed the extrinsic

---

[4] The conviction for the extrinsic offense in the *Charles* case occurred 16 years before the trial.

11

offense. *Id.; United States v. Jardina*, 747 F.2d 945, 952 (5th Cir. 1984), *cert. denied*, 470 U.S. 1058 (1985); *see Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 1501 (1988).

## CONCLUSION

It is respectfully submitted that upon considering the above, the defense has received notice of the Government's 404(b) evidence.

Respectfully submitted,

JAIME ESPARZA
UNITED STATES ATTORNEY

By:    /s/
PATRICIA AGUAYO
Assistant U.S. Attorney
Texas Bar #24059359
SARAH VALENZUELA
Assistant U.S. Attorney
Texas Bar #24089261
DEBRA P. KANOF
Assistant U.S. Attorney
Texas Bar #11093600
700 E. San Antonio, Suite 200
El Paso, Texas 79901
(915) 534-6884

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2024, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel of record.

/s/
PATRICIA AGUAYO
Assistant U.S. Attorney